J-S07032-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF T.A.T., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.O., MOTHER | : | No. 1939 EDA 2019 |

Appeal from the Decree Entered June 13, 2019
in the Court of Common Pleas of Philadelphia County
Family Court at No(s):  CP-51-AP-000605-2018

| | | |
|---|---|---|
| IN THE INTEREST OF T.A.T., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.O., MOTHER | : | No. 1940 EDA 2019 |

Appeal from the Order Entered June 13, 2019
in the Court of Common Pleas of Philadelphia County
Family Court at No(s):  CP-51-DP-0003044-2017

| | | |
|---|---|---|
| IN THE INTEREST OF: T.B.T., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.O., MOTHER | : | No. 1941 EDA 2019 |

Appeal from the Decree Entered June 13, 2019
in the Court of Common Pleas of Philadelphia County
Family Court at No(s):  CP-51-AP-0000603-2019

| | | |
|---|---|---|
| IN THE INTEREST OF: T.B.T., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.O., MOTHER | : | No. 1942 EDA 2019 |

Appeal from the Order Entered June 13, 2019
in the Court of Common Pleas of Philadelphia County
Family Court at No(s): CP-51-DP-0002127-2016

| | | |
|---|---|---|
| IN THE INTEREST OF: E.A.T., A MINOR | : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: J.O., MOTHER | : | No. 1943 EDA 2019 |

Appeal from the Decree Entered June 13, 2019
in the Court of Common Pleas of Philadelphia County
Family Court at No(s): CP-51-AP-0000604-2019

| | | |
|---|---|---|
| IN THE INTEREST OF: E.A.T., A MINOR | : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: J.O., MOTHER | : | No. 1944 EDA 2019 |

Appeal from the Order Entered June 13, 2019
in the Court of Common Pleas of Philadelphia County
Family Court at No(s): CP-51-DP-0000430-2017

BEFORE:  NICHOLS, J., KING, J. and STRASSBURGER, J.*

MEMORANDUM BY STRASSBURGER, J.:                    Filed: April 30, 2020

J.O. (Mother) appeals from the decrees entered June 13, 2019, which terminated involuntarily her parental rights to her children, T.B.T., a male born in May 2013, E.A.T., a female born in August 2015, and T.A.T., a male

_____

* Retired Senior Judge assigned to the Superior Court.

- 2 -

born in April 2017 (collectively, Children).[1]  Mother also appeals from the orders entered that same day, changing Children's permanent placement goals from return to parent or guardian to adoption.  We affirm.

The record reveals that the Philadelphia Department of Human Services (DHS) has a lengthy history of involvement with this family.  DHS obtained an order of protective custody (OPC) for T.B.T. on September 26, 2016, based on allegations that Mother lacked suitable housing.  However, the trial court lifted the OPC on September 28, 2016, instructing that DHS should obtain a new OPC once it learned of T.B.T.'s whereabouts.  The next action in this case took place on February 17, 2017, when DHS filed motions to compel Mother's cooperation in its general protective services investigation.  DHS averred that it received allegations that Mother struck one of the Children, that the family's whereabouts were unknown, and that it had been unable to complete its investigation due to Mother's lack of cooperation.  The court entered an order discharging the motion on February 27, 2017.

Finally, DHS obtained protective custody of Children on or about November 14, 2017.[2]  In its applications for protective custody, DHS averred

---

[1] The trial court entered separate decrees in which it terminated involuntarily the parental rights of T.T., who is the father of T.B.T. and E.A.T., and the putative father of T.A.T.  The court also entered a separate decree terminating involuntarily the parental rights of any unknown father that T.A.T. may have.  Neither T.T., nor any unknown father, appealed the termination of his parental rights.

that one of the Children[3] had suffered two black eyes but that Mother refused to permit a doctor to examine him. DHS further averred that Mother had been verbally aggressive toward DHS and hospital staff. The trial court entered shelter care orders on November 15, 2017, and orders adjudicating Children dependent on November 28, 2017.

Following the adjudications of dependency, Mother made little, if any, progress toward achieving reunification with Children. As detailed below, Mother failed to comply with the objectives in her Single Case Plan (SCP) and exhibited hostility toward Community Umbrella Agency (CUA) case managers. DHS filed its petitions to terminate involuntarily Mother's parental rights to Children on July 24, 2018, along with petitions to change Children's permanent placement goals from return to parent or guardian to adoption. DHS filed amended termination and goal change petitions on January 30, 2019.

---

[2] In the various pleadings filed in this matter, DHS indicates that it intended to obtain an OPC for T.A.T. on November 13, 2017, but that it obtained an OPC for T.B.T. in error. DHS indicates that it removed T.A.T. on November 13, 2017, but that it did not obtain an OPC for T.A.T. until November 14, 2017, and that it did not remove T.B.T. until November 14, 2017, despite obtaining an OPC for him on November 13, 2017.

[3] The record is inconsistent as to which of the Children suffered the injury. The applications for emergency protective custody for T.B.T. and T.A.T. indicate that T.B.T. suffered the injury. However, the application for emergency protective custody for E.A.T., as well as the dependency petitions and the subsequent pleadings for all three of the Children, indicate that T.A.T. suffered the injury.

The trial court held a hearing on the petitions on June 13, 2019, at the conclusion of which it announced that it would terminate Mother's parental rights and change Children's goals to adoption. The court entered decrees and orders memorializing its decision on June 13, 2019. Mother timely filed notices of appeal on July 10, 2019, along with concise statements of errors complained of on appeal.

Mother now raises the following claims for our review.

> 1. Whether the trial court's decision to involuntarily terminate [Mother's] parental rights to [Children] was not supported by clear and convincing evidence warranting such determination[.]
>
> 2. Whether the trial court's decision to change [C]hildren's permanency goal from reunification with the parent to adoption was not supported by clear and convincing evidence demonstrating that such decision would best protect [C]hildren's needs and welfare and be in [C]hild[ren's] best interests[.]

Mother's Brief at 5 (trial court answers omitted).[4]

---

[4] While Mother filed notices of appeal from the trial court's goal change orders, and while she purports to challenge the orders in her statement of questions involved, she does not develop her goal change claim in the argument section of her brief with citation to relevant legal authority. Thus, Mother has waived this claim. *See In re M.Z.T.M.W.*, 163 A.3d 462, 465 (Pa. Super. 2017) ("[T]his Court will not review a claim unless it is developed in the argument section of an appellant's brief, and supported by citations to relevant authority."). Further, even if Mother had preserved her goal change claim for our review, our decision to affirm the decrees terminating her parental rights would render that claim moot. *See In the Interest of D.R.-W.*, ___ A.3d ___, 2020 WL 465686 at *9 (Pa. Super. 2020) ("[E]ven if Father had not waived his goal change claim, it would be moot in light of our decision to affirm the court's termination decrees."). We therefore affirm the June 13, 2019 goal change orders.

We focus our analysis on the decrees terminating involuntarily Mother's parental rights to Children, which we review in accordance with the following standard.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Section 2511 of the Adoption Act governs involuntary termination of parental rights. *See* 23 Pa.C.S. § 2511. It requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in [subs]ection 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to [subs]ection 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In the instant matter, the trial court terminated Mother's parental rights pursuant to subsections 2511(a)(1), (2), (5), (8), and (b). We need

only agree with the court as to any one subsection of 2511(a), in addition to subsection 2511(b), to affirm. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Here, we analyze the court's decision pursuant to subsections 2511(a)(2) and (b), which provide as follows.

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> ***
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> ***
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.
>
> ***

23 Pa.C.S. § 2511(a)(2), (b).

We begin by considering whether the trial court committed an abuse of discretion by terminating Mother's rights pursuant to subsection 2511(a)(2).

> In order to terminate parental rights pursuant to 23 Pa.C.S.[]
> § 2511(a)(2), the following three elements must be met: (1)
> repeated and continued incapacity, abuse, neglect or refusal; (2)
> such incapacity, abuse, neglect or refusal has caused the child to
> be without essential parental care, control or subsistence
> necessary for his physical or mental well-being; and (3) the
> causes of the incapacity, abuse, neglect or refusal cannot or will
> not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). Critically, "[t]he grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted).

In its opinion, the trial court found that Mother remained incapable of parenting Children and failed to remedy the causes of their placement in foster care. Trial Court Opinion, 9/24/2019, at 4-6. The court emphasized Mother's failure to complete her SCP objectives and particularly her failure to address her mental health issues. *Id.*

Mother challenges the trial court's findings, insisting that the evidence DHS presented during the hearing "did not establish any substantial parental objective plan that [M]other failed to meet or could not remedy within a reasonable period of time to prohibit reunification." Mother's Brief at 17, 19. She emphasizes that DHS did not remove Children from her care for over a year after it became involved with the family and that it filed its termination petitions less than six months after she received her initial SCP. *Id.* at 20,

Mother contends that DHS and CUA rushed to terminate her rights and failed to provide her with the assistance necessary to achieve reunification. *Id.* at 20-22, 24-25. She directs our attention to her testimony during the hearing, which she argues demonstrates that she was capable of meeting Children's needs. *Id.* at 21-25.

Our review of the record supports the trial court's decision. During the hearing, DHS presented the testimony of CUA case management supervisor Sonya Jamison, CUA case manager Malia Gadson,[5] and CUA case manager Symone Brown, all of whom testified regarding Mother's lack of compliance with her SCP objectives. Mother's objectives included attending a domestic violence program, attending drug and alcohol and mental health treatment, submitting to random drug screens at the Clinical Evaluation Unit, obtaining housing and employment, and attending visitation with Children. N.T., 6/13/2019, at 7, 28-29, 44. However, Mother did not attend a domestic violence program, did not attend mental health and drug and alcohol treatment, did not submit to random drug screens, and did not provide proof of employment.[6] *Id.* at 7-10, 23-25, 29-30, 39-40, 44-45, 54.

_____

[5] Gadson's first name appears as "Malia" in the transcript of the hearing but as "Melea" elsewhere in the record.

[6] Jamison added that Mother received a referral for a parenting capacity evaluation but failed to comply, and that she refused to sign consent forms. N.T., 6/13/2019, at 30, 40.

Mother also failed to obtain appropriate housing. At the time DHS first became involved with Mother, she was living with her sister. *Id.* at 7. Later, Mother began living with her grandfather. *Id.* at 45. Jamison testified that Mother became "very combative" when CUA attempted to visit the home and insisted that the case manager not come inside. *Id.* at 38. Similarly, Brown testified that she visited Mother's home once, which "went fine," but that Mother was uncooperative and hostile during her subsequent attempt to perform a "pop-up" visit at the home. *Id.* at 48.

Perhaps most striking, however, was Mother's failure to attend visitation with Children. Between November 2017,[7] and May 24, 2018, Mother attended only 4 of 66 possible visits. *Id.* at 10. Between May 25, 2018, and October 24, 2018, Mother attended only 2 of 22 possible visits. *Id.* at 30-31. The record does not reveal the number of visits that Mother attended between October 2018 and February 2019. However, from February 27, 2019, until the time of the hearing on June 13, 2019, Mother attended only 1 of 16 possible visits. *Id.* at 44-45, 55. While Mother did have additional contact with Children via telephone, FaceTime, and/or Skype, it was unclear how often this type of contact occurred. *Id.* at 24, 41. Given Children's young ages, this type of contact is not a substitute for in-

_____

[7] Gadson listed the number of visits Mother attended starting in February 2017, although Children remained in Mother's care until November 2017. It appears that Gadson used February 18, 2017 as a start date because CUA assigned her to Mother's case at that time. *See* N.T., 6/13/2019, at 6, 10.

person visits that were available to Mother. Children's foster mother testified that Mother spoke to Children infrequently. *Id.* at 66. When asked if Mother spoke to Children on a weekly basis, the foster mother responded, "Maybe, sometimes, depending on who is in." *Id.*

Finally, the record demonstrates that Mother has been uncooperative and even overtly hostile to CUA. Gadson described an incident that took place during a visit on February 16, 2018, during which Mother began yelling at Children and using profanity. *Id.* at 10-12. She recalled,

> I tried to redirect her. I guess she didn't like what I was saying. She got irate and was using profanity towards me. So as I proceeded to leave the conference room where they was [*sic*] having the visit she got up and walked towards me, and that's when the agency had contacted police.
>
> ***
>
> THE COURT: What kind of language did she use?
>
> THE WITNESS: Called me B and MF'ers and just using that language, and then she said if I terminate her rights she was going to terminate my life.

*Id.* at 12.

CUA removed Gadson from the case and assigned a different case manager to Mother. *Id*. at 13. The trial court also entered a protective order on Gadson's behalf. Dependency Court Protective Order (T.B.T.), 2/28/2018. Apparently, Mother's interactions with her new case manager were not much better, as the court entered a protective order on his behalf

as well. N.T., 6/13/2019, at 31-32; Dependency Court Protective Order (T.B.T.), 10/2/2018.

Mother's belligerent behavior continued during the hearing on June 13, 2019. She interrupted the proceedings repeatedly, to the point where the trial court removed her from the courtroom. N.T., 6/13/2019, at 12-21. Mother later returned to the courtroom to testify. *Id.* at 80-96. However, at the conclusion of the hearing, when legal counsel for T.B.T. and E.A.T.[8] reported that his clients wanted their foster mother to adopt them, Mother became belligerent once again, resulting in the court's removing her for a second time. *Id.* at 98-99.

Accordingly, the record demonstrates that Mother has made little, if any, effort to comply with her SCP objectives and achieve reunification with Children. She has displayed a lack of interest in Children and their welfare by failing to attend visitation consistently, and has been uncooperative and

---

[8] Counsel explained that the trial court did not appoint him to represent T.A.T., who was only two years old at the time. N.T., 6/13/2019, at 69. ***See In re T.S.***, 192 A.3d 1080, 1092-93 (Pa. 2018) (holding that where a "child is very young and pre-verbal, there can be no conflict between the child's legal interests and his or her best interests; as such, the mandate of Section 2313(a) of the Adoption Act that counsel be appointed 'to represent the child,' 23 Pa.C.S. § 2313(a), is satisfied where the court has appointed an attorney-guardian *ad litem* who represents the child's best interests during such proceedings."). T.A.T. did have a separate guardian *ad litem* during the hearing.

hostile to CUA, the agency tasked with assisting her with reunification.[9] Based on the record, DHS demonstrated that Mother has been incapable of or has refused to provide Children with appropriate parental care, and that she cannot or will not remedy her parental incapacity and/or refusal at any point in the near future. As this Court has stated, "a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa. Super. 2006). Thus, we conclude that the court did not abuse its discretion by terminating involuntarily Mother's parental rights to Children pursuant to subsection 2511(a)(2).

Next, we consider if the trial court abused its discretion by terminating involuntarily Mother's parental rights pursuant to subsection 2511(b). We apply the following analysis.

> S[ubs]ection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, [subs]ection 2511(b) does not explicitly require a

---

[9] While Mother maintains that DHS and CUA failed to provide her with the assistance necessary to achieve reunification, this argument is meritless. Even accepting that DHS and CUA failed to provide Mother with reasonable reunification efforts, our Supreme Court has held that reasonable reunification efforts are not a prerequisite to the involuntary termination of parental rights pursuant to subsection 2511(a)(2). *In re D.C.D.*, 105 A.3d 662 (Pa. 2014).

bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (quotation marks and citations omitted).

Here, the trial court concluded that terminating Mother's parental rights would not have a detrimental effect on Children and would be in their best interests. Trial Court Opinion, 9/24/2019, at 6-7. The court emphasized the testimony of the CUA witnesses, which demonstrated that Children share a bond with their foster mother. *Id.* at 5-6. The court also emphasized the report of legal counsel for T.B.T. and E.A.T., who stated that his clients wanted their foster mother to adopt them. *Id.* at 5.

Mother argues in response that DHS failed to present sufficient evidence regarding the effect that terminating her parental rights would have on Children. Mother's Brief at 26-27. Specifically, Mother complains that DHS failed to present expert testimony during the hearing. *Id.* at 26.

- 14 -

She insists that this was a critical omission, because Children "have resided with and known [her] all their lives" and because she has "raised and cared for them since birth[.]" *Id.*

Contrary to Mother's assertions, the record reveals that she has failed to provide for Children for a significant portion of their lives. At the time of Children's placement in foster care in November 2017, T.B.T. was four-and-a-half years old, E.A.T. was two years old, and T.A.T. was six months old. By the time of the hearing on June 13, 2019, T.B.T. was six years old, E.A.T. was three-and-a-half years old, and T.A.T. was two years old. Thus, proportional to their ages, Mother missed a significant portion of their lives. Importantly, Mother had only minimal contact with Children following their placement, due to her failure to attend visitation consistently. The CUA witnesses testified regarding 104 possible visits that Mother could have attended. N.T., 6/13/2019, at 10, 30-31, 44-45, 55. Mother attended only seven of those visits and engaged in an unspecified amount of phone contact with Children. *Id.* at 10, 24, 30-31, 41, 44-45, 55. Given this dearth of contact, the record confirms that Children do not share a meaningful bond with Mother. *See Matter of Adoption of M.A.B.*, 166 A.3d 434, 449 (Pa. Super. 2017) ("[A] child develops a meaningful bond with a caretaker when the caretaker provides stability, safety, and security regularly and consistently to the child over an extended period of time.").

To the extent Mother argues that the trial court could not terminate her parental rights absent expert testimony addressing her relationship with Children, this contention is contrary to our law. This Court has explained that trial courts may rely on the opinions of agency caseworkers when conducting a subsection 2511(b) bonding analysis. *See In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010) ("When conducting a bonding analysis, the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well.") (citations omitted). Here, Brown testified that she did not believe Children share a bond with Mother, that terminating Mother's rights would be in Children's best interests, and that Children would not experience harm as a result. N.T., 6/13/2019, at 57-58. She testified that Children are thriving and happy in their pre-adoptive foster home, where they have resided since November 2017. *Id.* at 56-57. Brown added that Children refer to their foster mother as "mom." *Id.* at 57; *see T.S.M.*, 71 A.3d at 268 ("Common sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents."). Accordingly, we conclude that the court did not abuse its discretion by terminating involuntarily Mother's parental rights to Children pursuant to subsection 2511(b).

Based on the foregoing analysis, we conclude that the trial court did not abuse its discretion by terminating involuntarily Mother's parental rights

to Children and we affirm the court's termination decrees. Because Mother waived any challenge to the court's goal change orders, and because any such challenge would be moot due to our decision to affirm the termination decrees, we affirm those orders as well.

Decrees affirmed. Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/30/20